**FILED**

OCT **1 3** 2004

LARRY W. PROPES, CLERK
COLUMBIA, SC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

C/A NO. **3 04 22599 22**

| | |
|---|---|
| United States of America *ex rel.* Kenneth P. Orbeck, | ) ) ) |
| Plaintiffs, | ) ) ) |
| -vs- | ) ) ) |
| Marion County Medical Center, | ) ) ) |
| Defendant. | ) ) |

**FILED IN CAMERA AND UNDER SEAL**  Unsealed 7/18/0?

**COMPLAINT**

(False Claims Act, 31 U.S.C. §§3729-3733)

## PRELIMINARY STATEMENT

This lawsuit is based on the submission of false claims by Marion County Medical Center (hereinafter "MCMC"), which owns and operates Marion County Family Practice (hereinafter "MCFP"), to federal Medicare, CHAMPUS, and Medicaid programs and the fraudulent conduct of the Chief Executive Officer (hereinafter "CEO") and Chief Financial Officer (hereinafter "CFO") of MCMC. It appears that a physician employee of MCFP, conspired with the CEO and CFO of MCMC by presenting or causing to be presented, in making or causing to be made, or used false records or statements to get a false or fraudulent claim paid or approved by Medicare, CHAMPUS, and/or the Medicaid programs. The Relator, Kenneth P. Orbeck, D.O., acting on behalf of and in the name of the United States of America, brings this civil action under the *qui tam* provisions of the False Claims Act and alleges:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§1331 and 1345, and 31 U.S.C. §3732(a).

2.  This is an action to recover damages and civil penalties brought by Kenneth P. Orbeck, D.O. (hereinafter "Relator"), an individual, on behalf of the UNITED STATES OF AMERICA against Marion County Medical Center, d/b/a Marion County Family Practice, arising from the unlawful schemes and conspiracy to defraud the UNITED STATES OF AMERICA and the Medicare, CHAMPUS, and Medicaid programs in particular by submission by MCMC, separately and in concert with a physician employed by it, of false and fraudulent Medicare, CHAMPUS, and Medicaid claims for reimbursement to the United States Government in violation of the False Claims Act, as amended 31 U.S.C. §3729, *et seq*. ("False Claims Act").

3.  All of the alleged acts arose in the District of South Carolina. MCMC is a corporation organized and existing under the laws of the State of South Carolina, with its principal place of business and offices in the District of South Carolina. Accordingly, venue in this district is proper pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a). The physical address of MCMC is 2829 East Highway 76, Marion, South Carolina 29571-1150.

## IN CAMERA REVIEW

4.     Under the provisions of 31 U.S.C. §3730(b)(2), this Complaint is to be filed *in camera* and is to remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders. The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the Complaint and the material evidence and information establishing this cause of action.

## PARTIES

5.     Relator, Kenneth P. Orbeck, D.O. (the "Relator"), is a citizen of the United States of America and the State of South Carolina, and is suing in the name of and on behalf of the UNITED STATES OF AMERICA. From approximately April 2001 to the present time, MCMC employed the current CEO and from at least 1999 to the present it employed the current CFO. The CEO and CFO supervised and managed the medical practice known as Marion County Family Practice, which was owned by MCMC and were responsible for making or causing to be made, or submitting or causing to be submitted, fraudulent claims to Medicare, CHAMPUS, and Medicaid for in-patient admissions to its hospital which were unnecessary or if initially necessary, were excessive in terms of length of stay. The CEO and CFO, as part of an arrangement with a member of the medical staff and physician employee of MCFP, arranged to compensate the physician employee at a level in excess of what is reasonable in return for his maintaining a large number of admissions to the hospital, in direct violation of 42 U.S.C. §1395nn.

6.     None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the news media.

7.     Relator has direct and independent knowledge within the meaning of 31 U.S.C. §3730(e)(4)(B) of the information on which the allegations set forth in this Complaint are based, and he has voluntarily through his attorney provided the information to the government prior to filing this Complaint.

8.     As required by 31 U.S.C. §3730(a)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the District of South Carolina,

simultaneous with the filing of this Complaint, a statement of material evidence and information related to the Complaint.

9. The Defendant provides medical and healthcare services to the public and receives a substantial amount of funds from the Medicare, CHAMPUS, and Medicaid programs. The submission by Defendant to Medicare, CHAMPUS, and Medicaid for payment or reimbursement involves a representation and certification the Defendant will abide by and has abided by and that it will adhere to and has adhered to all of the statutes, rules, and regulations governing the Medicare, CHAMPUS, and Medicaid programs. All of the actions attributed to Defendant in this Complaint were taken by employees and/or agents of Defendant, acting within the scope of their employment and/or agency.

10. The United States Department of Health and Human Services (hereinafter "HHS") acting by and through the Centers for Medicare and Medicaid (hereinafter "CMS") is an agency of the UNITED STATES OF AMERICA responsible for administering the federal Medicare Program, see 42 U.S.C. §1395, et seq, under which healthcare facilities and providers may be reimbursed with federal funds for services provided to eligible patients or Medicare beneficiaries.

## APPLICABLE REGULATORY BACKGROUND

11. The Medicare Program which provides federal reimbursement for medically necessary services and supplies used by eligible persons or Medicare beneficiaries ("beneficiaries" or "patients") was established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. §1395, et seq. Medicare health reimbursement is governed by statute and by regulations issued by HHS.

12. CMS is responsible for the administration of the Medicare Program and contracts with private companies in each state known as "intermediaries" and "carriers" to administer Part A and Part B of the Medicare Program, respectively.

13. Medicare allows payments under Part A to acute care hospitals, including the facility owned by the Defendant, based on annual cost reports filed with intermediaries, based on claims for services rendered to Medicare beneficiaries, and based on Defendant's designation as a rural health initiative. Payments for claims for services are based on the basis of appropriate diagnostic related groupings (hereinafter "DRGs") for inpatient stays, on the basis of a fee for

service arrangement based on prevailing charges established by the intermediaries for services, and based on the admission meeting generally accepted admission criteria.

14.     Medicare allows payments under Part B (supplementary medical insurance for the aged and disabled) to cover non-institutional services such as physician services and is customarily made on reasonable charge basis.

15.     When individual physicians and group practices of physicians request payment from Medicare Part B for services provided to Medicare beneficiaries, the individual physicians or group practices of physicians are required to submit their application or claim for payment to the Medicare carrier on a proper claim form designated by CMS. See, 42 C.F.R. §424.32. Because MCMC owned MCFP, it through its agents, servants or employees, acting within the scope of their employment, would have been responsible for submitting such claims.

16.     42 U.S.C. §1320a-7b prohibits anyone from knowingly and willfully making or causing to be made any false statement or representation of a material fact in any application for any benefit or payment under a federal healthcare program.

17.     The provisions of 42 U.S.C. §1320a-7(b)(b)(1)(2) and (3), commonly known as the Anti-kickback statute, provide as follows:

> (b) Illegal remunerations
>
> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind-
>
>> (A) in return for referring an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.
>
>> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in

kind to any person to induce such person-

    (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
    (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both

(3) Paragraphs (1) and (2) shall not apply to-
    (A) a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program;
    (B) any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services;
    (C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program if-
        (i) the person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and
        (ii) in the case of an entity that is a provider of services (as defined in section 1395x(u) of this title), the person discloses (in such form and manner as the Secretary requires) to the

       entity and, upon request, to the Secretary the
       amount received from such vendor with respect
       to purchases made by or on behalf of the entity;
    (D) a waiver of any coinsurance under Part B of
    subchapter XVIII of this chapter by a Federally
    qualified health care center with respect to an
    individual who qualifies for subsidized services
    under a provision of the Public Health Service Act
    42 U.S.C.A.§ 201 et seq.;
    (E) any payment practice specified by the Secretary in
    regulations promulgated pursuant to section 14(a) of
    the Medicare and Medicaid Patient and Program
    Protection Act of 1987; and
    (F) any remuneration between an organization and an
    individual or entity providing items or services, or a
    combination thereof, pursuant to a written agreement
    between the organization and the individual or entity
    if the organization is an eligible organization under
    section 1395mm of this title or if the written agreement,
    through a risk-sharing arrangement, places the individual
    or entity at substantial financial risk for the cost or
    utilization of the items or services, or any combination
    thereof, which the individual or entity is obligated to
    provide.

18. Since January 1, 1997, when the Health Insurance Portability and Accountability Act of 1996 (hereinafter "HIPAA") became effective, the Anti-kickback rules were extended to all federal programs, including CHAMPUS and Medicaid, except for the Federal Employee Health Benefit Program.

19. Effective July 1, 1995, 42 U.S.C. §1395nn, commonly known as "Stark II", prohibits a physician from referring Medicare and Medicaid patients for designated health services to entities in which the referring physician has a financial relationship. Conversely, the acceptance by a hospital of a Medicare or Medicaid patient as a result of a referral from a physician having a "financial relationship" (as defined by statute) with the entity providing healthcare is unlawful. Stark II prohibits a hospital (or other healthcare provider) from submitting Medicare claims for payment based on such referrals. The statute also expressly prohibits the payment of any Medicare claims submitted in violation of 42 U.S.C. §1395nn(a)(1).

20. 42 U.S.C. §1395nn(b) provides ten general exceptions which allow referrals

Page 7 of 19

between a physician and such entities which maintain financial relationships. If the financial relationship between the physician and entity does not fall within one of the exceptions, then a physician may not make a referral to any entity with which the physician may have a financial relationship for the "furnishing of designated health services. Designated health services consist of: (a) clinical laboratory services, (b) physical therapy services, (c) occupational services, (d) radiology or other diagnostic services, (e) radiation services, (f) durable medical equipment, (g) parenteral and enteral nutrients, equipment, and supplies, (h) prosthetics, orthotic, and prostatic devices, (i) home health services, (j) out-patient prescription drugs, and (k) in-patient and out-patient hospital services. Moreover, the regulations implementing 42 U.S.C. §1395nn expressly require that any entity collecting payment for a service "performed under a prohibited referral must refund all collected amounts on a timely basis". 42 C.F.R. §411.353.

21. The applicable provisions of Stark II specify "financial arrangements" as "an ownership or investment interest in the entity to which a referral is made" or a "compensation arrangement between the physician and the entity." If the financial arrangement consists of a compensation arrangement, Stark II provides that the physician or entity which is a party to the compensation arrangement and which submits a bill for services is in violation of Stark II unless the terms of the arrangement meet certain requirements. The terms of such personal service arrangements are permissible under Stark II if the arrangement is set out in writing, signed by the parties, specifies the services covered by the arrangement, the arrangement covers all services to be provided by the physician to the entity, the aggregate services do not exceed those reasonable and necessary for legitimate business purpose, is for a term of at least one (1) year, the amount of the reimbursement is commercially reasonable and "does not exceed fair market value". See 42 U.S.C. §1395nn(e)(3) and 42 C.F.R. §411.357.

22. As a condition of participation in the Medicare Program, MCMC and/or MCFP and all physicians employed by either entity, completed and signed Medicare enrollment applications which contained the certification and representation by MCMC/MCFP and the employed physicians that they individually accepted the responsibility for insuring (a) adherence to all Medicare laws and guidelines which dictate the proper operation of their businesses; (b) adherence to guidelines as outlined by the federal government; and (c) that there would be no

prohibited referrals nor prohibited billings to Medicare.

23. As a further condition of participation in the Medicare Program and as a condition precedent to the receipt of reimbursement from Medicare of costs incurred for treating and providing care to Medicare beneficiaries, MCMC/MCFP is/are required to complete and have actually completed on an annual basis cost reports on CMS Form 2552 which contained representations and certifications by an officer of MCMC/MCFP that he or she was "familiar with the laws and regulations regarding the provision of healthcare services, and that the services identified in this cost report were provided in compliance with such laws and regulations". The submission of such form and information contained therein is an essential element in the Medicare claims process. The CMS claims form contains language similar to the following:

> **"MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED <u>OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL</u>, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT."**

24. The Administrators of Defendant on each CMS claim form were required to, and have, certified that he or she is

> "familiar with the laws and regulations regarding the provision of healthcare services, and that **the services identified in this cost report were provided in compliance with such laws and regulations."**
> (Emphasis added.)

25. Most hospitals, including the hospital and physician practice owned by the Defendant, operate under the prospective payment system (PPS) for its cost reporting periods occurring on or after October 1, 1983. Under the PPS, Medicare pays a fixed amount of money for hospital admissions of Medicare beneficiaries determined by the Diagnostic Related Group (DRG) into which the beneficiaries fall. This means that a pre-determined, fixed and set all or nothing Medicare payment is made to hospitals based on the DRG assigned to the specific beneficiary so long as the hospital admission is medically necessary.

26. 42 U.S.C. §1395ww(a) provides:

Sec. 1886(a)(1)(A)(i) The Secretary, in determining the amount of the payments that may be made under this title with respect to operating costs of inpatient hospital services (as defined in paragraph 4) shall not recognize as reasonable (in the efficient delivery of health services) cost for the provision of such services by a hospital for a cost reporting period to the extent such costs exceed the applicable percentage (as determined under clause (ii) ) of the average of such costs for all hospitals in the same grouping as such hospital for comparable time periods.

> (ii) For purposes of clause (i), the applicable percentage for hospital costs reporting periods beginning–
> (I) on or after October 1, 1982, and before October 1, 1983 is 120 percent;
> (II) on or after October 1, 1983, and before October 1, 1984, is 115 percent; and
> (III) on or after October 1, 1984, is 110 percent.

(B)(i) For purposes of subparagraph (A) the Secretary shall establish case mix indexes for all short-term hospitals, and shall set limits for each hospital based upon the general mix of types of medical cases with respect to which such hospital provides services for which payment may be made under this title.

> (ii) The Secretary shall set such limits for a cost reporting period of a hospital–
> (I) by updating available data for a previous period to the immediate preceding cost reporting period by the estimated average rate of change of hospital costs industrywide, and
> (II) by projecting for the cost reporting period by the applicable percentage increase (as defined in subsection (b)(3)(B)).

(C) The limitation established under subparagraph (A) for any hospital shall in no event be lower than the allowable operating costs of inpatient hospital services (as defined in paragraph (4)) recognized under this title for such hospital for such hospital's last cost reporting period prior to the hospital's first cost reporting period for which this section is in effect.

(D) Subparagraph (A) shall not apply to cost reporting periods beginning on or after October 1, 1983.

(2) The Secretary shall provide for such exemptions from, and exceptions and adjustments to, the limitation established under paragraph (1)(A) as he deems appropriate, including those which he deems necessary to take into account

(A) the special needs of sole community hospitals, of new hospitals, of risk based health maintenance organizations, and of hospitals which provide atypical services or essential community services, and to take into account extraordinary circumstances beyond the hospital's control, medical and paramedical education costs, significantly fluctuating population in the service area of the hospital, and unusual labor costs,

(B) the special needs of psychiatric hospitals and of public or other hospitals that serve a significantly disproportionate number of patients who have low income or are entitled to benefits under part A of this title, and

(C) a decrease in the inpatient hospital services that a hospital provides and that are customarily provided directly by similar hospitals which results in a significant distortion in the operating costs of inpatient hospital services.

(3) The limitation established under paragraph (1)(A) shall not apply with respect to any hospital which

(A) is located outside of a standard metropolitan statistical area, and

(B)(i) has less than 50 beds, and
(ii) was in operation and had less than 50 beds on the date of the enactment of this section.

(4) For purposes of this section, the term "operating costs of inpatient hospital services" includes all routine operating costs, ancillary service operating costs, and special care unit operating costs with respect to inpatient hospital services as such costs are determined on an average per admission or per discharge basis (as determined by the Secretary), and includes the costs of all services for which payment may be made under this title that are provided by the hospital (or by an entity wholly owned or operated by the hospital) to the patient during the 3 days (or, in the case of a hospital that is not a subsection (d) hospital, during the 1 day) immediately preceding the date of the patient's admission if such services are diagnostic services (including clinical diagnostic laboratory

tests) or are other services related to the admission (as defined by the Secretary). Such term does not include costs of approved educational activities, a return on equity capital, or, other capital-related costs (as defined by the Secretary for periods before October 1, 1987).

Essentially, 42 U.S.C. §1395ww(a) prohibits separate payment of nonphysician outpatient services provided to a Medicare beneficiary up to 3 days immediately preceding a hospital admission.

    27.    Effective January 1, 1991 diagnostic services, including clinical diagnostic laboratory tests, provided to a Medicare beneficiary by the admitting hospital or <u>by an entity wholly owned and operated by the hospital</u> within 3 days prior to the date of the beneficiary's admission to the hospital are deemed to be inpatient services and included in the inpatient DRG payment unless there is no Part A coverage. Diagnostic services are defined as those services that have the following revenue codes on the bill:

| Code | Description |
|---|---|
| 254 | Drugs incident to other diagnostic services |
| 255 | Drugs incident to radiology |
| 30X | Laboratory |
| 31X | Laboratory pathological |
| 32X | Radiology diagnostic |
| 341 | Nuclear medicine, diagnostic |
| 35X | CT scan |
| 40X | Other imaging services |
| 46X | Pulmonary function |
| 48X | Cardiology with HCPCS codes 93015, 93307, 93308, 93320, 93501, 93503, 93505, 93510, 93526, 93541, 93542, 93543, 93544, 93552, 93561 or 93562 |
| 53X | Osteopathic services |
| 61X | MRI |
| 62X | Medical/surgical supplies, incident to radiology or other diagnostic services |
| 73X | EKG/ECG |

  74X EEG
  92X Other diagnostic services

**FIRST CAUSE OF ACTION**
**(31 U.S.C. §3729(a)(1) - False Claims)**
**VIOLATION OF ANTI-KICKBACK STATUTE, STARK II STATUTE**
**AND 42 U.S.C. §1320a-7b**

  28. This is a civil action by Kenneth P. Orbeck, D.O. acting on behalf of and in the name of the UNITED STATES OF AMERICA, against Marion County Medical Center.

  29. The allegations of Paragraphs One (1) through Twenty-seven (27) are herein re-alleged as fully and effectually as if set forth herein verbatim.

  30. Between 1997 and up to the present, MCMC participated in, sought reimbursement from, and actually received funds from Medicare Part A and Medicare Part B, CHAMPUS, and Medicaid programs for providing services and supplies to Medicare, CHAMPUS, and Medicaid beneficiaries who were admitted to the hospital owned and operated by Defendant by a physician with whom it had compensation or employment agreement. As a result of providing services and supplies to Medicare, CHAMPUS, and Medicaid, MCMC submitted, caused to be submitted, or assisted or supervised the submission of claims to Medicare, CHAMPUS, and Medicaid for payment.

  31. More specifically, for at least the past five years, MCMC sought reimbursement from, and actually received funds from Medicare Part A and Part B, CHAMPUS, and Medicaid programs for providing inpatient and outpatient services and supplies to Medicare, CHAMPUS, and Medicaid beneficiaries in a hospital or physician practice owned by it. Additionally, MCMC participated in, sought reimbursement from, and actually received funds from Medicare, CHAMPUS, and Medicaid for providing services and supplies to Medicare, CHAMPUS, and Medicaid beneficiaries in its hospital, hospital ancillary facilities, office ancillary facilities, or hospital-owned physician offices, for outpatient services by an employee who was an employee of MCMC. As referenced above, the process for requesting payment for these services rendered to Medicare, CHAMPUS, and Medicaid beneficiaries required the submission of individual claim forms for each patient on the appropriate DRG for in-patient stays, the submission of a claim based on a fee for service based on prevailing charges for in-patient and outpatient

services, and on the representation that the services or supplies provided to the Medicare, CHAMPUS, or Medicaid beneficiaries were medically necessary.

32. At all times during the relevant period and continuing to the present, MCMC owned and operated MCFP, which employed Relator and James Carroll, MD.

33. MCMC individually or in concert with one or more physicians, committed fraud and abuse in the compensation arrangements by devising a plan or scheme intended to reward any physician who admitted a large volume of patients to its hospital. MCMC actually knew or should have known by virtue of its Utilization Review Committee of the Medical Staff, that most of the admissions being made were either not medically necessary or even when necessary exceeded the appropriate length of stay. Furthermore, as part and parcel of such arrangement, MCMC caused to be paid to one of its employed physicians a monthly compensation more than one hundred percent (100%) in excess of fair market value and reasonable for a family practitioner in a rural community.

34. In furtherance of its plan and scheme with an employed physician, MCMC, by its participation in a rural health initiative, received payment in excess of those established for the DRG, frequently being equal to 100% of charges, when it knew or should have known that the majority of such in-patient admissions were not medically necessary and the condition of such patients was being mis-stated or exaggerated in an effort to justify the admission.

35. The over-utilization of in-patient admissions by one or more physicians employed by or with whom it had compensation arrangements, was done solely for the purpose of maintaining a patient census of twenty-five to forty patients per day and the resulting revenues realized from such admissions.

36. The conduct and actions of MCMC were in direct violation of the statutes and regulations affecting the Federal administration of Medicare, CHAMPUS, and Medicaid health payment funds, and resulted in it applying for and receiving Medicare, CHAMPUS, and Medicaid payments far in excess of that to which it would have been entitled had the compensation arrangement and scheme not existed or had the in-patient admissions and length of stay been medically necessary.

37. The conduct of MCMC was in direct violation of the statutes and regulations

by knowingly and willfully compensating a physician in excess of fair market value.

38. If the United States of America had been aware of the violations by MCMC of the statutes and regulations regarding Medicare, CHAMPUS, and Medicaid, it would not have paid, or caused to be paid, Medicare, CHAMPUS, and Medicaid claims submitted by MCMC for services rendered by it or physicians employed by it. MCMC concealed its illegal activities from the United States of America in an effort and for the specific purpose of defrauding the United States of America into paying Medicare, CHAMPUS, and Medicaid claims that it otherwise would not have paid. The submission of Medicare, CHAMPUS, and Medicaid claims by MCMC involves a representation and certification that it would abide by and has abided by, and that it will adhere and has adhered to all of the statutes, rules and regulations governing the Medicare, CHAMPUS, and Medicaid programs.

39. MCMC's submission of cost reports to CMS for the relevant period and until the present, included services to patients whose physicians had received kickback or illegal inducements prohibited by 42 U.S.C. §1320a-7b(b) and/or other laws, thus rendering the CMS cost reports as "false records or statements".

40. By submission of cost reports for services rendered to patients, which services and billing therefor were unlawful by virtue of the existence of a prohibited financial relationship and for services and supplies which were not medically necessary or exceeded the necessary length of stay, the cost reports were rendered as "false records or statements". Specifically, the statements contained in the cost reports that "the services identified in this cost report were provided in compliance with such laws and regulations" and "were medically necessary" were false.

41. As a result of the representations of MCMC and the physician with whom it was acting in concert to defraud the United States Government, both in the enrollment application and annual cost reports, Medicare, CHAMPUS, and Medicaid relied upon MCMC and the treating physician that it had complied and would comply with and adhere to all laws and guidelines, and did rely upon the representations that there would be no prohibited billings to Medicare, CHAMPUS, and Medicaid in violation of any law and regulation and, based upon these representations, the United States made payments to MCMC for claims submitted to it that

it would not have made had it known that the representations and certifications completed on the Medicare enrollment applications and on annual cost reports were false.

42.     As a result of the conduct of MCMC, it has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1) and 42 U.S.C. §1320a-7b(b)(1).

43.     The United States of America has been damaged as a result of the violation of the False Claims Act by MCMC and Plaintiff is entitled to be reimbursed for monies obtained by MCMC and for the amount of money by which it has over-compensated an employed physician, for fraudulent claims it presented or caused to be presented for payment or approval to the United States of America.

44.     Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of 31 U.S.C. §3729(a)(1) by MCMC.

45.     Plaintiff is entitled to a civil penalty between $5,000.00 and $10,000.00 as required by 31 U.S.C. §3729(a)(1) for each fraudulent claim of MCMC.

46.     Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

## SECOND CAUSE OF ACTION
## (31 U.S.C. §3729(A)(2)

47.     The allegations of Paragraphs One (1) through Forty-six (46) are herein re-alleged as fully and effectually as if set forth herein verbatim.

48.     Plaintiff alleges that in performing the acts hereinbefore set forth, MCMC knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of American in violation of 31 U.S.C. §3729(a)(2) and 42 U.S.C. §1320a-7b(b)(1).  As a result MCMC has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729)a)(2) and 42 U.S.C. §1320a-7b(b)(1).

49.     The United States of America has been damaged as a result of the violation of the False Claims Act by MCMC and Plaintiff is entitled to be reimbursed for monies obtained by MCMC for fraudulent claims it presented or caused to be presented for payment or approval.

Furthermore, Plaintiff is entitled to be reimbursed for the excessive compensation paid to a physician employed by MCMC in violation of 42 U.S.C. §1395nn.

50. Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by MCMC.

51. Plaintiff is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(2) for each fraudulent claim of MCMC.

52. Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

### THIRD CAUSE OF ACTION
### (31 U.S.C. §3729(A)(3)

53. The allegations of Paragraphs One (1) through Fifty-two (52) are herein re-alleged as fully and effectually as if set forth herein verbatim.

54. Plaintiff alleges that in performing the acts hereinbefore set forth, MCMC knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of American in violation of 31 U.S.C. §3729(a)(3) and 42 U.S.C. §1320a-7b(b)(1). As a result MCMC has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729)a)(3) and 42 U.S.C. §1320a-7b(b)(1).

55. The United States of America has been damaged as a result of the violation of the False Claims Act by MCMC and Plaintiff is entitled to be reimbursed for monies obtained by MCMC for fraudulent claims it presented or caused to be presented for payment or approval. Furthermore, Plaintiff is entitled to be reimbursed for the excessive compensation paid to a physician employed by MCMC in violation of 42 U.S.C. §1395nn.

56. Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by MCMC.

57. Plaintiff is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(2) for each fraudulent claim of MCMC.

58. Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

## FOURTH CAUSE OF ACTION
## (31 U.S.C. §3729(A)(7))

59.     The allegations of Paragraphs One (1) through Fifty-eight (58) are herein re-alleged as fully and effectually as if set forth here verbatim.

60.     Plaintiff alleges that in performing the acts hereinbefore set forth, MCMC knowingly made, used, or caused to be made or used false records or statements to get a false or fraudulent claim paid or approved by the government to the damage of the United States of American in violation of 31 U.S.C. §3729(a)(7) and 42 U.S.C. §1320a-7b(b)(1).  As a result MCMC has knowingly presented or caused to be presented to an officer or employee of the United States of America false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(7) and 42 U.S.C. §1320a-7b(b)(1).

61.     The United States of America has been damaged as a result of the violation of the False Claims Act by MCMC and Plaintiff is entitled to be reimbursed for monies obtained by MCMC for fraudulent claims it presented or caused to be presented for payment or approval. Furthermore, Plaintiff is entitled to be reimbursed for the excessive compensation paid to a physician employed by MCMC in violation of 42 U.S.C. §1395nn.

62.     Plaintiff is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by MCMC.

63.     Plaintiff is entitled to a civil penalty between $5,000 and $10,000 as required by 31 U.S.C. §3729(a)(7) for each fraudulent claim of MCMC.

64.     Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. §3730(d).

WHEREFORE, Plaintiffs demand judgment against Marion County Medical Center as follows:

(a)     That by reason of the violations of the False Claims Act as set out in the four causes of action, this Court enter judgment against Marion County Medical Center in an amount equal to three times the amount of damages the United States of America has sustained because of its actions, plus a civil penalty of not less than Five Thousand Dollars ($5,000) and not more than Ten Thousand Dollars ($10,000) for each violation pursuant to 31 U.S.C. §3729(a);

(b)   That Relator, as *Qui Tam* Plaintiff, be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act and any other applicable provision of law;

(c)   That Relator be awarded all costs of this action, including a reasonable attorney's fee and court costs; and

(d)   That the United States of America and Relator have such other relief as the Court deems just and proper.

ERNEST J. NAUFUL, JR., P.C.

By: _____
Ernest J. Nauful, Jr.
Federal Bar #2508
1321 Lady St., Suite 670
P. O. Box 11866
Columbia, SC 29211
(803) 256-4045
Attorney for Relator

October 12 ~~September~~ _____, 2004.